**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| The Belt Railway Company of Chicago, | |
| Plaintiff/Counter-Defendant, | |
| v. | Case No. 24 C 1395 |
| International Association of Sheet Metal, Air, Rail, and Transportation Workers, Transportation Division, | Hon. LaShonda A. Hunt |
| Defendant/Counter-Plaintiff. | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff/Counter-Defendant The Belt Railway Company of Chicago ("Belt Railway") and Defendant/Counter-Plaintiff International Association of Sheet Metal, Air, Rail, and Transportation Workers, Transportation Division ("SMART-TD") each filed actions challenging Belt Railway's recent change to "hump operations" that involved assigning each of the two helpers on a "hump crew" to their own locomotive instead of the same locomotive, and SMART-TD's right to strike in response to the change. Currently pending before the Court are the parties' cross-motions for preliminary injunction. Resolution of this matter turns on whether Belt Railway's new operational policy constitutes a "minor" or "major" dispute for purposes of the Railway Labor Act. Following expedited briefing and an evidentiary hearing, the Court concludes that, for the reasons stated below, this is a minor dispute and, as such, SMART-TD may not strike or engage in other self-help measures pending arbitration of the matter. Accordingly, Belt Railway's motion [13] is granted and SMART-TD's motion [29] is denied.

## BACKGROUND

The Court presumes familiarity with the procedural history of this case as set forth in the March 7, 2024 order extending the initial status quo temporary restraining order. (Dkt. 39). The parties presented evidence pertaining to their fully briefed motions for preliminary injunction on March 19, 2024. At the conclusion of the hearing, the Court took the motions under advisement and extended the TRO pending their adjudication. (Dkt. 41). The following facts are gleaned from the relevant filings, evidence, and witness testimony.

Belt Railway is a rail carrier headquartered in Illinois that operates the largest intermediate switching terminal railroad in the United States. SMART-TD is a national labor union that represents train service employees, including approximately 120-130 workers employed by Belt Railway, by negotiating and policing collective bargaining agreements.

Belt Railway and SMART-TD are parties to several collective bargaining agreements that date back decades. Belt Railway primarily relies on two agreements in this case: the Memorandum of Agreement dated February 14, 1961, and the Crew-Consist Agreement dated April 13, 1990. (JX6; JX1).[1] The 1961 Agreement sets forth rules for when management is or is not required to recognize certain "normal routines of work," along with the notice requirements for any changes to normal routines of work. (JX6 §§ 2, 3, 7). The 1990 Crew-Consist Agreement governs the staffing of train service employees on various types of crews, including the hump crews at issue in this case. (JX1).

_____

[1] Unless otherwise noted, all "JX" references are to the Joint Exhibits submitted by the parties. Typically, the Court requires parties to formally move for admission of exhibits into evidence at the end of a hearing or trial. Although the Court forgot to raise that issue here (and the parties presumably assumed it was unnecessary for joint exhibits), every unopposed exhibit presented to a witness during the hearing would have been accepted into evidence. Therefore, all such exhibits are deemed part of the record.

Under the 1990 Crew-Consist Agreement, there are three types of hump crews: the East Hump Crew, the West Hump Crew, and the Extra Hump Crew. In pertinent part, the agreement provides as follows:

> The East Hump Crew will consist of a hump conductor and two helpers. The West Hump Crew will also consist of a hump conductor and two helpers. When an "Extra Hump Crew" is required to assist humping operations on either side of the hump, the crew will consist of two helper positions.
>
> ***
>
> Under no circumstances will employees be required to operate with less than the required crew consist specified in this Agreement, nor will they be censured or disciplined in any manner for refusal to do so.

(JX1 art. 3(d) & 5(a)).

Belt Railway operates a "hump yard" where incoming trains are broken down and assembled into new outgoing trains. Carrier locomotives (train cars with engines) bring incoming trains to Belt Railway and leave them in a receiving yard. A Belt Railway locomotive attaches to an incoming train and moves it along the tracks up a small hill called the "hump." At the top of the hump, pins connecting the train cars are pulled manually and the separated train cars roll down different tracks using gravity and then stop using an automated braking system in a classification yard. New outgoing trains are assembled there and then moved to a departure yard to await pick up by a carrier locomotive. Trains arrive and depart the hump yard from the East and the West, so there are receiving, classification, and departure yards on both the East and West side of the hump. The hump yard operates 24 hours a day, 7 days a week, 365 days a year.

Groups of employees that work in the hump yard are referred to as "hump crews." There are three shifts each day. Hump crews—consisting of a conductor and two helpers—work on each side of the hump and are designated as East and West Hump Crews. The East and West hump

conductors work in a command center, changing switches remotely to direct train cars onto different tracks, while the East and West helpers work in the hump yard. When an Extra Hump Crew is required on either the East or West side of the hump, it also has two helpers. Thus, at minimum staffing, there would be a total of six employees, made up of one conductor and two helpers on the East Hump Crew and the same on the West Hump Crew. At maximum staffing, when Extra Hump Crews are required on both sides of the hump, there would be a total of ten employees, made up of the original six on the East and West Hump Crews, and an additional four helpers, two on each side of the hump.

The two helpers on each hump crew have always been assigned to a single locomotive. One helper would work at the hump, controlling the locomotive with a remote control operation ("RCO") box and pulling the pins that connect the cars so that they roll down the tracks to the classification yard. The second helper would work in the cab of the locomotive, essentially on standby to take control of the locomotive with an RCO box as needed.

During hump operations, trains sometimes need to be stopped and reversed. When that happens, the helper at the hump would "pitch" (i.e., give) control of the locomotive to the helper in the cab of the locomotive. According to Stel Paras, the general chairperson of SMART-TD's local committee, the reason control would be pitched from one helper to the other in those situations is that the person in control of the locomotive must be able to see directly in front of the train in the direction that it is traveling to make sure no one is in the way. This practice is referred to in the trade as "protecting the point." Both sides agree that federal regulations require some sort of visual confirmation that there is no one in front of a locomotive before it is moved in that direction. Belt Railway's president and general manager, Percy Fields, explained that both the conductor and the helper at the hump have access to live video from over 200 cameras positioned

around the yard so that they can remotely check to see if there is anyone in front of the train before moving it. In the event that no helper is in the cab and no camera covers the area in front of the train, the conductor, the helper at the hump, or another worker could be sent to check in person. According to Mr. Fields, this procedure would comply with applicable federal regulations.

On Friday, February 16, 2024, Belt Railway notified SMART-TD that there would be a change in hump operations effective Tuesday, February 20, 2024. Specifically, Belt Railway would be eliminating the Extra Hump Crews and assigning each helper on the East and West Hump Crews to his or her own locomotive. Under the new operation there would be six total workers, three on each side of the hump: a conductor in the command center; one helper controlling one locomotive with an RCO box; and the other helper controlling a second locomotive with an RCO box. SMART-TD immediately responded to Belt Railway with a "non-acquiescence letter," vehemently disagreeing with the change and asking by what authority Belt Railway purported to act. (JX4). Belt Railway replied in writing the following day explaining the basis for its proposed actions and seeking confirmation that SMART-TD would handle the matter as a minor dispute (i.e., that there would be no strike). (JX5).

In the following days, the parties' representatives exchanged calls. SMART-TD informed Belt Railway that there would be a poll vote about whether to strike over the hump operation changes at a monthly member meeting scheduled to take place the evening of February 20, 2024. When asked by Belt Railway for assurances that SMART-TD would not strike, SMART-TD confirmed only that the president of the organization would need to authorize a strike and the poll vote itself could not grant such authority. Belt Railway's director of labor relations, Christopher Steinway, explained that he understood SMART-TD's non-acquiescence letter to mean that SMART-TD would handle the matter as a major dispute and potentially strike if the changes were

implemented. SMART-TD's witnesses explained that such letters were commonplace and that there had not been a strike at Belt Railway since 1968. Brent Leonard, Smart-TD's vice president, confirmed during his testimony that SMART-TD would not strike if the Court finds that this dispute is minor.

The crux of the dispute over the change to hump operations stems from the parties' respective understandings of the 1961 and 1990 Agreements. Belt Railway views Section 3 of the 1961 Agreement as a source of authority to change the "normal routine of work" when it "is not apparent, not necessary, or does not exist[.]" (JX6 § 3). Under this provision, Belt Railway maintains that it is entitled to change the normal routine of work for helpers on the East and West Hump Crews by splitting them up to work on separate locomotives, as the old "normal routine of work" is no longer necessary due to advances in technology that allow workers to control and monitor trains remotely. Belt Railway then reads Section 3(d) of the 1990 Crew Consist Agreement to require only two helpers on the East and West Hump Crews and points out that there is no express language requiring the helpers to work on the same locomotive or defining "crew" in such a way. SMART-TD's representatives adamantly disagree with Belt Railway's position, arguing that the word "crew" has long-standing use in the railway industry to mean that employees on the same crew work together as a unit on the same locomotive. Under SMART-TD's reading of Section 3(d), there would be no need for express language on that point because the definition of the word "crew" necessarily means that the helpers would work as a unit on the same locomotive.

Belt Railway insists that management has regularly exercised discretion to adjust work assignments for employees represented by SMART-TD. Specifically, Belt Railway claims that it has routinely changed job assignments by eliminating unnecessary positions in a variety of contexts. For example, over the past 15 years, Belt Railway has reduced "pulldown" and utility

assignments, abolished the hump yardmaster and reallocated the duties of that position, installed remote-controlled switches and reassigned related work, and assigned "mixed-practice" work. While Belt Railway admits that it has generally staffed the hump yard with an East Hump Crew, a West Hump Crew, and two Extra Hump Crews, Belt Railway has also assigned only one Extra Hump Crew on one side of the hump on many occasions, including in the weeks leading up to the disputed change. SMART-TD concedes that the Extra Hump Crew has been eliminated in the past when there was a low volume of cars to process but contends that the reduction always resulted in the elimination of two helpers working on a single locomotive and never resulted in only two helpers working separately on their own locomotives. Nevertheless, according to Mr. Steinway, "[t]here was never any mutual intent to prescribe a 'per-train' helper complement, especially when the relevant agreement speaks in terms of a minimum crew for the location." (JX54 ¶ 16).

The parties have been engaged in negotiations about crew size for years. In past bargaining rounds, Belt Railway proposed broad discretion to determine crew size depending on its business needs. SMART-TD has opposed such discretion but has been willing to accept some changes in crew size in exchange for other accommodations. In the prior three rounds of bargaining (2009, 2014, and 2019), the parties have been unable to reach resolution on the issue. Mr. Steinway testified that Belt Railway has always sought broad discretion to permit management to determine the size of various crews, including but not limited to hump crews. But Belt Railway insists that it has never sought to bargain about adjusting the workflow of the two helpers on a hump crew because the operative agreements have always provided the discretion to implement the change at issue. SMART-TD's representatives recall the bargaining history quite differently. According to Mr. Paras and John Lesniewski, former vice president of SMART-TD, the parties expressly and

specifically discussed changes to the size of the hump crews, including reduction to a one-person train crew, in prior rounds of bargaining. (JX41, JXS 43-48).

Representatives from both parties testified about the actual and potential ramifications of this dispute. For as long as Belt Railway is prohibited from implementing changes to the hump operations, Mr. Steinway and Mr. Fields claim that the carrier will lose the opportunity for revenue of approximately $30,000 per day due to increased productivity, incur extra labor costs of $7,500 per day as a result of being unable to reassign hump crew helpers to other positions and then having to hire new employees to fill those positions, and potential attorney's fees of up to $100,000 to file an appeal, none of which are recoverable through arbitration if Belt Railway ultimately prevails. As a result, if Belt Railway is prohibited from implementing the change until this dispute is resolved, it asks that SMART-TD be ordered to post a bond of $500,000. Furthermore, Belt Railway's witnesses testified that the effects of a strike at their facility would be far-reaching and immense. Belt Railway is the largest intermediate switching terminal in the country, so any work stoppage would have massive consequences for the national rail network, causing huge financial consequences for shippers who are under contract to deliver goods within a specific time frame and jeopardizing the public due to delays in the shipment of chemicals necessary for modern life, including supplying clean drinking water.

On the other hand, SMART-TD's witnesses spoke of the effects that changes in work assignments could have on its members. Some of those effects are quantifiable, for example, if an employee is assigned to a different position that pays less, the difference in compensation can easily be calculated. Calculating those potential losses gets more complicated as time goes on and as more workers are affected, but it is still possible and there is a formal process for making those claims. Still, because any workers compensated under that scheme would be paid at the rate in

effect at the time of the loss and not any interest, SMART-TD claims that they can never truly be made whole financially. As to nonquantifiable losses, SMART-TD's witnesses discussed the potential consequences that delayed payment of wages can have on a person's life, including inability to pay bills and other ripple effects. In the end, however, SMART-TD agreed that it would not strike if the Court found that the dispute is minor. In addition, SMART-TD sought only a nominal bond amount in the event that either party is enjoined from its desired action.

Having considered the evidence, testimony, arguments, and applicable authority, the Court is now ready to rule.

## LEGAL STANDARD

To obtain a preliminary injunction, a movant must demonstrate: (1) a likelihood of success on the merits; (2) irreparable harm; and (3) inadequacy of traditional legal remedies. *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018); *Northeast Ill. Reg'l Commuter Rail Corp. v. Int'l Ass'n of Sheet Metal, Air, Rail, and Transp. Workers - Transp. Div.*, 578 F. Supp. 3d 985, 996 (N.D. Ill. 2022). If the movant successfully demonstrates all three requirements, the analysis continues to the "balancing phase." *Northeast*, 578 F. Supp. 3d at 996. This involves considering "the harm the plaintiff will suffer without an injunction against the harm the defendant will suffer with one." *Courthouse*, 908 F.3d at 1068. To make the assessment, a sliding scale is used: the more likely the movant is to win, the less heavily the balance needs to weigh in the movant's favor and vice versa. *Northeast*, 578 F. Supp. 3d at 996. As a final consideration, the court must evaluate the impact of a preliminary injunction on non-parties and the public generally. *Id.*

**DISCUSSION**

**I.** **Likelihood of Success: "Major" or "Minor" Dispute**

The Railway Labor Act (RLA), 45 U.S.C. § 151 *et seq.*, serves to, among other things, "avoid any interruption to commerce or to the operation of any carrier engaged therein . . . provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions . . . [and] provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions." 45 U.S.C. § 151(a). The RLA establishes specific procedures for addressing "major" and "minor" disputes between parties. While the RLA does not use the terms "major" or "minor," nor articulate a standard to distinguish between them, these terms have emerged from "the vocabulary of rail management and rail labor." *Consol. Rail Corp. v. Ry. Lab. Execs.' Ass'n*, 491 U.S. 229, 302 (1989) (hereinafter "*Conrail*"). A "major" dispute is one in which a party is seeking to create contractual rights. *Id.* The RLA addresses "major" disputes in 45 U.S.C. §§ 152 Seventh and 156. Section 152 Seventh of the RLA forbids changes in "the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements or in section 156 of this title." 45 U.S.C. § 152 Seventh. Section 156 sets out the procedures a carrier must follow when it wants to implement a major change, which include mandatory bargaining and mediation processes, along with a requirement that the parties maintain the "status quo" until resolution. *Conrail*, 491 U.S. at 302. It is only after exhaustion of these processes that a strike or other forms of economic self-help may be used if no agreement has been reached. *Id.* at 303.

On the contrary, a "minor" dispute is one in which a party seeks to enforce a preexisting contractual right. *Id.* at 302. "Minor" disputes are codified at 45 U.S.C. §§ 152 Sixth and 156 First(i). Specifically, § 152 Sixth defines these disputes as "arising out of grievances or out of the

interpretation or application of agreements concerning rates of pay, rules, or working conditions." 45 U.S.C. § 152 Sixth. If a dispute is minor, the parties are required to engage in mandatory, binding arbitration before the National Railroad Adjustment Board and, in the meantime, the carrier may implement the proposed change. *Conrail*, 491 U.S. at 303-04. A strike by a union over a minor dispute is unlawful. A dispute is considered minor if it is not frivolous or obviously insubstantial and can arguably be justified. *Id.* at 306-07. The burden to show that a dispute is minor is light. *Id.* at 307. Additionally, because the RLA seeks to avoid disruptions to the nation's railways, "in making the choice between major and minor, there is a large thumb on the scale in favor of minor, and hence arbitration." *Brotherhood of Locomotive Eng'rs & Trainmen v. Union Pac. R.R. Co.*, 879 F.3d 754, 758 (7th Cir. 2017).

The role of federal courts in this situation is limited to determining whether the dispute is major or minor so that it may be adjudicated through the proper channels as envisioned by the RLA. *Id.* at 757. The parties each present compelling arguments about the propriety of Belt Railway's operational change in light of the contractual language, past practices of the parties, and their prior bargaining history. After careful consideration, the Court concludes that this dispute is properly classified as minor.

**A.  <u>Contractual Language</u>**

First, as discussed *supra*, the parties present differing interpretations of the applicable contractual language. Pointing to the 1990 Crew-Consist Agreement, Belt Railway focuses on the absence of an explicit requirement that two helpers work on the *same* locomotive, while SMART-TD emphasizes the fact that "crew" is a term defined in the railway industry to refer to two helpers working together as a unit on the same locomotive. For a dispute to be deemed minor, Belt Railway need only articulate an argument that is not frivolous or obviously insubstantial and can arguably

be justified. *Conrail*, 491 U.S. at 306-07. "Better-than-frivolous is a low bar, but a bar nonetheless." *Brotherhood of Locomotive Eng'rs*, 879 F.3d at 758.

The Court believes that Belt Railway has met this standard. Neither the 1961 Agreement nor the 1990 Crew-Consist Agreement contain language expressly providing that the two helpers on a hump crew must be assigned to the same locomotive, let alone that they can't be split up to each work on a separate locomotive. As such, Belt Railway has offered an arguably justified reading that the 1990 Crew-Consist Agreement focuses on the location of the crews—one East Hump Crew and one West Hump Crew—rather than the number of locomotives to which crew members may be assigned. Still, the Court questions whether Belt Railway's sudden operational change just as the parties are beginning the bargaining process flies in the face of the spirit of the current agreements. The uncontested testimony of SMART-TD's representatives was that "crew" in the railway industry signifies a two-person team on a single locomotive. However, the fact that each party offers a plausible interpretation does not render Belt Railway's interpretation frivolous. *Nat'l Ry. Lab. Conf. v. Int'l Ass'n of Machinists & Aerospace Workers*, 830 F.2d 741, 749 (7th Cir. 1987). In short, because nothing in the 1990 Crew-Consist Agreement defines the word "crew" to mean "workers per train" as SMART-TD suggests, Belt Railway's geographic location interpretation is at least plausible. It may be that the word "crew" carries the meaning claimed by SMART-TD, but that is an issue for an arbiter to decide on a more developed record.

### B. Past Practices

It is undisputed that, for decades, each "hump crew" at Belt Railway has consisted of two helpers working on the same locomotive as a unit. Belt Railway concedes this point but contends this is a vestige of pre-RCO operations. According to Belt Railway, it has regularly exercised its discretion to adjust a variety of work assignments in the past, and the fact that it chose not to assign

hump crew helpers to separate locomotives in the past does not mean it lacked the discretion to do so. Again, SMART-TD urges the Court to find this evidence of Belt Railway's past practice persuasive.

SMART-TD is correct that past practices are instructive to the major or minor question, as they may be considered to form part of the agreement despite their absence from the written agreement. *See, e.g.*, *BLET GCA UP v. Union Pac. R.R. Co.*, 988 F.3d 409, 413-14 (7th Cir. 2021) (finding that even though there was no contractual text that expressly authorized a railroad to make changes to attendance policy, the course of dealing for over twenty years provided "solid ground" for railroad to consider dispute to be minor). "[T]he major-minor dichotomy treats interpretation or application of express and implied contractual terms indistinguishably. Thus, the relevant terms of an agreement are not only those that are written down; they also include the parties' practice, usage, and custom as they carry out their agreement." *Brotherhood of Locomotive Eng'rs*, 879 F.3d at 758. Nevertheless, to be considered part of an agreement, past practices cannot contradict the text of the agreement. *Chi. & N. W. Transp. Co. v. Ry Lab. Execs. Ass'n.*, 855 F.2d 1277, 1283 (7th Cir. 1988).

In *Chi. & N.W. Transp.*, the Seventh Circuit addressed whether the sale of a segment of a railroad track constituted a major or minor dispute pursuant to the parties' collective bargaining agreement. 855 F.2d at 1277. For twenty years before the sale at issue, the railway had sold or abandoned unprofitable segments of its rail tracks, adversely affecting the jobs of many employees represented by various unions. *Id.* at 1279. The railway argued that the dispute was minor because not only did the collective bargaining agreements authorize the sale of the track, but "it ha[d] for some twenty years taken similar actions . . . without objection . . . and without a demand from the unions that the § 6 RLA procedures be initiated." *Id.* at 1284. The Seventh Circuit held that

"because nothing in the record indicate[d] that the purported body of past practice relied on by [the railway was] inconsistent with the express provisions of the [collective bargaining] agreements, [the railway's argument could not] be rejected out of hand." *Id.* at 1285. Although the railway made arguments that were "subject to challenge, they [were] at least plausible." *Id.*

Likewise, Belt Railway has presented a nonfrivolous argument that its past practices support this exercise of discretion under the operative agreements. Mr. Steinway testified that Belt Railway has a long history of eliminating positions that it deems unnecessary as well as altering the number of workers on the hump (i.e., by choosing to operate without one or both of the Extra Hump Crews). Although Mr. Paras contends that Belt Railway's arguments of past practice are without merit because they do not involve the removal of a crew member, the Court cannot say that Belt Railway's significant change to the normal routine of work for hump crews was not allowed. Again, the Court recognizes that the Belt Railway's arguments here, like the railway's arguments in *Chi. & N.W. Transp.*, *supra*, are certainly subject to challenge. But the jurisdiction of this Court is limited to deciding if SMART-TD must assert those objections through the procedures mandated by the RLA for minor disputes.

SMART-TD relies on *Detroit & Toledo Shore Line R.R. Co. v. United Transp. Union* ("*Shore Line*"), in arguing that having two helpers work on a single locomotive is a working condition that, as a consistent past practice, has become part of the parties' agreement. However, SMART-TD's reliance on *Shore Line* is misplaced. In *Shore Line*, the parties disputed the working conditions to be maintained to continue the "status quo" pending resolution of a **major** dispute. 396 U.S. 142, 143 (1969) (emphasis added). Put another way, that case considered issues that come into play only if this Court has determined that the dispute is major, which as discussed, it is not. *Shore Line* is therefore inapplicable.

14

C. **Prior Bargaining**

Finally, the parties have offered contradictory explanations of their history in bargaining over the size of hump crews. Belt Railway contends that it has negotiated for broad discretion to control crew size, rather than specifically adjusting the hump crew size. SMART-TD claims that the parties have expressly and specifically discussed this exact topic at the bargaining table. SMART-TD argues that such prior negotiations demonstrate that Belt Railway knows it cannot make this change without having to bargain for it (in other words, this change is major), which would render Belt Railway's argument frivolous.

The Seventh Circuit has cautioned that a railroad may not "lie its way to arbitration." *Brotherhood of Locomotive Eng'rs*, 879 F.3d at 758. Thus, if SMART-TD "were to produce evidence that foreclosed [Belt Railway's] interpretation, it might succeed in showing that the railroad's position is obviously insubstantial." *Id.* SMART-TD cites *Flight Options, LLC v. Int'l Brotherhood of Teamsters, Loc. 1108*, in support of its argument that Belt Railway's present arguments regarding their reading of the agreements and past practices are made in bad faith, as the parties have negotiated this very topic numerous times in the past. 863 F.3d 529, 539 (6th Cir. 2017). Indeed, *Flight Options* quotes *Conrail* in stating that an argument made in bad faith cannot arguably justify a party's interpretation of the contractual language. *Id.* But the Court is not convinced that SMART-TD has produced such evidence. The admitted exhibits and testimony establish that prior bargaining efforts involved Belt Railway's attempts to reduce hump crews from three total crew members to two crew members, which is distinct from the issue of assigning two hump crew helpers to their own locomotives.

SMART-TD relies on two additional cases to show that Belt Railway is aware that changes to the hump crew operations must be bargained for, but those too are nonstarters. *Wheeling & Lake*

*Erie Ry. Co. v. Brotherhood of Locomotive Eng'rs & Trainmen*, involved a carrier's attempt to eliminate a provision of the parties' agreement related to crew consist, "so that the Railroad would not have to assign a union conductor to each train." 789 F.3d 681, 685 (6th Cir. 2015). Section 6 notices (*i.e.*, notices required under the RLA to negotiate major changes) were served numerous times by the carrier in an attempt to eliminate the contractual provision at issue, and the parties "engaged in direct bargaining over both parties' Section 6 notices on numerous occasions without success." *Id.* at 686. The Sixth Circuit held that the explicit contractual language supported the union's position and that, "[b]y serving a Section 6 notice on the union in 2003, the Railroad acknowledged the RLA requirement that it negotiate with the union if it wishes to revise or remove the crew consist provision from the . . . Agreement." *Id.* at 693. Two critical factual distinctions exist between *Wheeling* and the instant case. First, the Court has already determined that Belt Railway's argument regarding contractual language is not frivolous or obviously insubstantial. Second, the Section 6 notices issued by Belt Railway involved changes to its discretion to adjust crew size, rather than the reallocation of helpers to assign one helper per train while maintaining the same crew size. In contrast, in *Wheeling*, the Section 6 notices directly correlated with the changes the carrier later made absent proper bargaining procedures.

Similarly, SMART-TD cites *Burlington N. R.R. Co. v. United Transp. Union* for the same proposition—namely, the service of Section 6 notices shows that this is a major dispute. In *Burlington*, the collective bargaining agreements required crews "consisting of one engineer, one conductor and one or two brakemen." 862 F.2d 1266, 1269 (7th Cir. 1988). For cost efficiency, the carrier granted its subsidiary "trackage rights," and the parties disagreed about whether the granting of such rights violated the collective bargaining agreement. *Id.* at 1270. The carrier first negotiated with the union over the proposed trackage rights, and the Seventh Circuit found,

16

therefore, that the carrier's "own conduct undermine[d] its position." *Id.* at 1274. As with *Wheeling*, *Burlington* is distinguishable in that the contractual language of the 1961 Agreement and 1990 Crew-Consist Agreement make Belt Railway's position arguably justified and the assignment of the two-person hump crew helpers to his/her own locomotive has never been on the bargaining table. Accordingly, this dispute is indeed minor.

## II. <u>Irreparable Harm and Inadequacy of Traditional Remedies</u>

Finding that Belt Railway has demonstrated a likelihood of success on the merits, the Court next considers whether either party will suffer irreparable harm if injunctive relief is not granted in its favor. Harm is irreparable if legal remedies are inadequate to cure it. *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021). "Inadequate does not mean wholly ineffectual; rather, the remedy must be seriously deficient as compared to the harm suffered." *Id.* (internal quotations omitted).

Here, Belt Railway argues that it will suffer irreparable harm if it is prohibited from implementing these changes to hump operations. Specifically, Belt Railway claims that it will lose the opportunity to earn approximately $30,000 in additional revenue per day and incur extra labor costs of $7,500 per day and significant attorney's fees associated with a potential appeal. Notably, Belt Railway contends that lost revenue or costs incurred would not be recoverable in arbitration. Additionally, Belt Railway contends that the effects of a strike would cause massive consequences for the national rail network, Belt Railway's customers, and the general public. SMART-TD labels Belt Railway's arguments of irreparable harm as "scare tactics," and highlights the fact that Belt Railway has failed to demonstrate an imminent threat of a strike, especially in light of the fact that there has been no strike at Belt Railway since 1968.

SMART-TD further argues that this is a major dispute; thus, no finding of irreparable injury is necessary. Nonetheless, SMART-TD claims that it will suffer irreparable injury if Belt Railway is permitted to implement the new hump crew operations. According to SMART-TD, "such a unilateral change in working conditions would effectively upset SMART-TD's bargaining leverage and ability to reach a fair settlement. . . . Moreover, left undeterred, [Belt Railway] may well be encouraged to further chip away at the parties' negotiated agreement on crew size one position and one creative argument at a time." (SMART-TD Mem. at 26.)

SMART-TD offered testimony that the proposed changes in work assignments would have far-reaching negative consequences for its members. Specifically, SMART-TD witnesses testified that full compensation may be delayed and employees may lose their jobs, resulting in a failure to make mortgage and car payments, potential divorce proceedings as a result of such hardship, and loss of medical insurance. Additionally, according to SMART-TD, because no interest is paid on any relief awarded by an arbitration board, the employees will never be made whole financially. In response, Belt Railway offered testimony from John Hennecke, former director of labor relations for the National Railway Labor Conference, to demonstrate that SMART-TD could and likely would file claims on behalf of any employee that it felt was adversely affected by Belt Railway's changes to the hump operations and those employees could be made whole by an award from the arbitration board.

Based on these facts, Belt Railway has demonstrated that it will suffer irreparable harm if it is prohibited from implementing the changes to the hump operations or SMART-TD is allowed to engage in work stoppage. Courts in the past have recognized the unique difficulties inherent in railway strikes, which is that railways, unlike manufacturers, cannot increase production before and/or after a strike to recoup lost profits. *Chi. & N.W. Transp. Co.*, 908 F.2d at 148. Moreover, the

parties do not dispute that Belt Railway would be unable to recover any loss profits or costs incurred while waiting for an arbitration decision.

The Court is not convinced that SMART-TD will suffer any irreparable harm. It is true that a damage remedy may be inadequate where an employer's action threatens a permanent loss of jobs. *See Loc. Lodge No. 1266, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Panoramic Corp.*, 668 F.2d 276, 286 (7th Cir. 1981) (finding that monetary compensation would not be an appropriate remedy where sale of corporate assets in alleged violation of collective bargaining agreement would result in immediate loss of employment for 113 employees represented by the union). However, that is not the case here. Mr. Steinway explained that Belt Railway does not anticipate any layoffs pursuant to these staffing changes. Rather, the impact will be felt in hiring practices long term. Thus, SMART-TD's contention that employees may lose their jobs and any snowball effects resulting from such job loss are purely speculative, and a party "cannot obtain a preliminary injunction by speculating about hypothetical future injuries." *E. St. Louis Laborers' Loc. 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 706 (7th Cir. 2005). SMART-TD's argument that employees cannot be made whole through monetary relief also fails. Monetary relief in the form of backpay is provided to make litigants whole on a daily basis in courts across the country. *See, e.g., Ne. Illinois Reg'l Commuter Rail Corp. v. Int'l Ass'n of Sheet Metal, Air, Rail, & Transp. Workers - Transp. Div.*, 578 F. Supp. 3d 985, 997 (N.D. Ill. 2022) (finding that union failed to meet irreparable harm requirement and explaining that if adjustment board disagreed with court's holding that dispute was minor, backpay would be available and would make employee whole).

### III. __Balance of Harms__

Finally, when balancing the potential harm to both Belt Railway and SMART-TD, the scales tip in favor of Belt Railway. The necessity of efficient and continuous rail traffic in the United States cannot be overstated. Indeed, the Railway Labor Act was undoubtedly passed with an eye towards keeping the rails moving smoothly when possible. *See, e.g.*, *Brotherhood of Locomotive Eng'rs*, 879 F.3d at 755, 758 ("No one wants to see the nation's transportation network brought to a standstill because of labor conflict. The RLA therefore is designed to substitute bargaining, mediation, and arbitration for strikes;" "A primary goal of the RLA is to avoid disruptions to commercial use of the railways."). On the other hand, the Court sees no reason why SMART-TD and its members cannot be made whole with monetary relief in the event the National Railroad Adjustment Board finds that the proposed change to hump operations should not have been implemented.

### IV. __Bond__

Upon granting a motion for preliminary injunction, the Court is required to order a bond pursuant to Rule 65(c). Fed. R. Civ. P. 65(c). However, at the end of the March 19 hearing, both parties suggested that the Court need not set a bond if a decision on the merits were issued. The Court agrees. Resolution of their claims alleviates the need for any bond. Accordingly, the Clerk is directed, forthwith, to release the bonds of $1,000 previously posted by both parties in connection with entry of the TRO.

### V. __Merits Determination__

On March 20, 2024, Belt Railway filed its Answer to SMART-TD's Verified Counterclaim. (Dkt. 42). Because Belt Railway and SMART-TD have each responded to the complaint and counterclaim filed by the other, it is appropriate for the Court to now issue a decision on the merits.

Under Federal Rule of Civil Procedure 65(a)(2), "the hearing for a preliminary injunction can be consolidated with the trial on the merits before or after the commencement of the hearing for a preliminary injunction." *Am. Train Dispatchers Dep't of Int'l Bhd. of Locomotive Eng'rs v. Fort Smith R.R. Co.*, 121 F.3d 267, 269-70 (7th Cir. 1997) (finding that trial court did not abuse its discretion in consolidating preliminary injunction hearing and trial on the merits where the dispute encompassed only one factual issue—whether the National Mediation Board had issued a directive that the parties meet to negotiate in Washington, D.C.); *see also Burlington N. R.R.. Co. v. Sheet Metal Workers' Int'l Ass'n*, 636 F. Supp. 809, 811 (N.D. Ill. 1986) (finding that party would not be prejudiced by advancing preliminary injunction hearing to trial on the merits where the limited issue in case was whether dispute over temporary work assignment was major or minor under the RLA). Accordingly, for the reasons articulated in section I, *supra*, the Court finds in favor of Belt Railway on its complaint seeking a declaratory judgment that this is a minor dispute and against SMART-TD on its counterclaim for a determination that this is a major dispute.

## <u>CONCLUSION</u>

For all the foregoing reasons, Belt Railway's motion for preliminary injunction [13] is granted and SMART-TD's motion for preliminary injunction [29] is denied. The Court finds this to be a minor dispute, subject to jurisdiction of the National Railroad Adjustment Board.


**Dated**: March 26, 2024                                   **ENTERED**:


                                                            LaShonda A. Hunt
                                                            United States District Judge



21